IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ROBERT ALLEN REMINES, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 7:13-CV-178 |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff Robert Allen Remines ("Remines") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding that he was not eligible for supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f. Remines alleges that the Administrative Law Judge ("ALJ") committed error in evaluating his mental impairments and determining that his substance abuse disorder was a contributing factor material to the determination that he was disabled. I conclude that substantial evidence supports the ALJ's decision on all grounds. Accordingly, I **RECOMMEND DENYING** Remines' Motion for Summary Judgment (Dkt. No. 11), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 16.

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Remines failed to demonstrate that he was disabled

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

1

under the Act.[2] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). In cases such as this, where the claimant has submitted additional evidence to the Appeals Council, and the Appeals Council considered that evidence, this court must review the record as a whole, including the new evidence, to determine whether substantial evidence supports the Commissioner's findings. Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 95–96 (4th Cir. 1991).

## **CLAIM HISTORY**

Remines protectively filed for SSI on September 23, 2009, claiming that his disability began on September 24, 1997. R. 167. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 63–93, 92–96, 101–06. On September 27, 2011, ALJ Thomas W. Erwin held a hearing to consider Remines' disability claim. R. 38–62. Remines was represented by an attorney at the hearing, which included testimony from Remines, his mother Helen Lemons, and vocational expert James Williams. R. 37.

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

2

On October 14, 2011, the ALJ entered his decision analyzing Remines' claim under the familiar five-step process[3] and denying his claim for benefits. R. 15–30. The ALJ found that Remines suffered from the severe impairments of polysubstance abuse, history of alcohol abuse, depression, anxiety, and status post left finger lacerations. R. 20. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 21. The ALJ determined that considering all of Remines' impairments, including his substance use disorder, Remines retained the he retained the residual functional capacity ("RFC") to perform a range of medium work with other restrictions involving an inability to sustain work and required absences. R. 22. Under this RFC inclusive of Remines' substance use disorder, the ALJ found that no jobs existed in the national economy which Remines could perform. R. 24.

However, the ALJ further found that if Remines stopped his substance abuse, Remines retained an RFC to perform medium work, but would be restricted from climbing ladders, ropes, or scaffolds, and that he should avoid machinery and heights hazards. R. 26. Regarding his mental functionality, the ALJ found that Remines would be able to maintain attention and concentration for short periods of time commensurate with simple, routine, repetitive, unskilled tasks, and that he could engage in only occasional interaction with coworkers, supervisors, and the public. R. 26. The ALJ determined that Remines had no relevant past work (R. 29), but that

---

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

Remines could work at jobs that exist in significant numbers in the national economy, such as a kitchen helper, marker/price changer, and garment sorter. R. 30. Thus, the ALJ concluded that he was not disabled. R. 30. On February 22, 2013, the Appeals Council denied Remines' request for review (R. 1–4), and this appeal followed.

## ANALYSIS

The thrust of Remines' argument is that the ALJ improperly found that his substance use disorder was a contributing factor material to the ALJ's determination that Remines was disabled, and that if he stopped using substances, he would not be disabled. Therefore, Remines contends, the ALJ's decision is not supported by substantial evidence. I disagree, and find that the ALJ's conclusions about Remines' substance use and his decision as a whole is supported by substantial evidence in the record.

Under 42 U.S.C. § 423(d)(2)(C), "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." The regulations further provide that the "key factor" in determining whether determining whether alcoholism is a contributing factor material to the determination of disability, is whether the claimant would still be disabled if he or she stopped using substances. 20 C.F.R. 404.1535. This analysis requires that the ALJ determine which of the claimant's limitations would remain if he stopped using substances, and then determine whether these limitations would be disabling. Remines bears the burden of proving that he would still be disabled absent his use of substances. Shoulars v. Astrue, 671 F. Supp. 2d 801, 811 (E.D.N.C. 2009).

4

Remines' bouts with substance abuse, and alcohol in particular, are well documented in the record. So too are his complaints of depression and anxiety, which date back to when he was 14 years old. R. 299–302. Remines began drinking significant amounts of alcohol when he was a teenager (R. 381) and alcohol use coincides with the worst episodes of mental health decompensation. In the sustained periods he remained sober, however, the record shows that Remines' mental health stabilized and that he was functional.

On June 3, 2008, Remines was taken to the hospital after exhibiting violent and destructive behavior while intoxicated and off medication. R. 323–25. At that time, Remines admitted abusing a number of drugs, including cocaine, Xanax, Percocet, marijuana, and alcohol. R. 325. Remines reported self-inflicted cuts, cigarette burns, tattoos, and branding. Remines did not meet the criteria for a temporary detention order ("TDO"), and he was referred to outpatient counseling. Remines was again hospitalized on June 17, 2008 after expressing suicidal ideations and cutting himself while intoxicated. R. 307–313. Remines also stated that a month prior he took a gun, loaded a bullet in the chamber, stuck it in his mouth, pulled the trigger, and "was disappointed when it didn't go off." R. 311 Remines stated that he drank alcohol heavily, and that he snorted Xanax and other pills as recently as that day. R. 311–12. As a result of his suicidal ideations with active substance abuse, Remines was sent to the Southwest Virginia Mental Health Institute on a TDO. R. 314.

While detained, Remines stated that as recently as two weeks prior, he drank daily up to a pint to one-fifth of bourbon, plus six to 12 beers, in addition to abusing pills and marijuana. Remines described mood swings that lead him to drink. R. 336. Providers ruled out bipolar disorder, and instead diagnosed Remines with alcohol dependence, nicotine dependence, cannabis abuse, and benzodiazepine abuse. R. 337, 339. Remines was assessed with a Global

5

Assessment of Functioning score of 50.[4] Remines was discharged after three days, and agreed to follow up with recommended treatment, which included remaining sober and free of all illicit drugs, participating in Alcoholics Anonymous ("AA"), and undergoing counseling. R. 339–40.

On September 15, 2008, licensed clinical psychologist Christopher M. Carusi, Ph.D. performed a consultative examination of Remines. R. 379–83. Remines reported various symptoms to Dr. Carusi, including sleep and appetite disturbance; sadness; crying; frequent worry; feelings of hopelessness, helplessness, and worthlessness; mood swings; irritability; difficulty in crowds; and anhedonia. R. 380. Remines also stated that he abused marijuana, pain medications, cough syrup, and alcohol. Remines said that he consumed alcohol "almost every day" from age 21 until June 2008. R. 381.

On mental status examination, Dr. Carusi found Remines to be properly oriented to time, place, person, and situation, and that he had no short- or long-term memory impairments. R. 381. Remines' judgment and insight were adequate, he described his mood as "just here," and his affect appeared slightly dysthymic and anxious. Dr. Carusi described Remines' effort during the evaluation as "variable" and noted that Remines' self-reporting was inconsistent with medical records that had been reviewed, and therefore considered his self-reporting questionable. R. 382. Dr. Carusi diagnosed Remines with polysubstance dependence and a GAF score of 62, suggesting mild symptoms or some difficulty in social or occupational functioning. Dr. Carusi found that "[i]t is likely that he is capable of understanding direction[s], including simple and more detailed and complex directions….It is possible that Mr. Remines' currently reported

---

[4] The Global Assessment of Functioning is a numeric scale ranging from 0 to 100 used by mental health professionals to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health illness." Diagnostic and Statistical Manual of Mental Disorders, 32 (4th Ed. Am. Psychiatric Ass'n 1994) ("DSM IV"). The DSM IV defines GAF scores as follows: a score of 41–50 suggests serious symptoms or serious impairment in social or occupational functioning; a score of 51–60 suggests moderate symptoms or difficulty in social or occupational functioning; a score of 61–70 suggests mild symptoms or some difficulty in social, occupational, or school functioning. DSM IV.

6

symptoms may interfere with his ability to maintain consistent attendance, but are not likely to significantly impair his comprehension, performance, or relationships at work." R. 382–83.

Remines was brought to counselor Judy Fiebig at the Mount Rogers Community Services Board ("Mount Rogers") on October 30, 2008, after reporting depression while in custody pending criminal charges. R. 425. Ms. Fiebig noted that Remines' appearance and behavior was unremarkable, although he appeared sad. Ms. Fiebig referred him for a medication assessment with his primary care physician.

Remines began an intermittent series of visits to Kyndal Beavers, M.D., at the Brock Hughes Free Clinic ("Free Clinic") on December 18, 2008 for complaints of depression and anxiety, which had been causing insomnia. R. 435. Dr. Beavers prescribed Remines psychotropic medication and he was told to continue counseling treatment with Mount Rogers. The next month, Remines reported that the new medication helped him sleep. R. 423.

On January 21, 2009, Remines reported that he drank about 12 beers a day, and as many as 36 on occasion. R. 432. Ms. Fiebig at Mt. Rogers encouraged him to undergo detoxification. Remines stated that the "alcohol keeps him sedated but it is taking quite a few beers now to keep sedated." R. 423. Later that month, Remines told Dr. Beavers at the Free Clinic that he still gets depressed once or twice a day, but not "24/7" as he had previously. R. 434. At that time Dr. Beavers noted that Remines was more conversive, had a brighter affect, and had better eye contact. Dr. Beavers noted that Remines' anxiety and depression was improving, recommended continued counseling, and adjusted his medication. R. 434. Dr. Beavers also told Remines to start substance abuse classes.

In February and March 2009, Dr. Beavers noted that Remines was stable and improved, and continued his treatment plan. R. 432–33. At a visit to Ms. Fiebig at Mt. Rogers on March

7

2009, Remines presented with the smell of beer on his breath, and reported that "he is cutting back but not out yet." R. 422. Ms. Fiebig noted moderate treatment progress on April 2, 2009, and Remines stated that he could now socialize when he was sober. R. 421. Dr. Beavers again found Remines to be "doing well" with no complaints on his medication on May 4, 2009. R. 431.

Remines regressed in mid-May 2009, and due to renewed suicidal ideations he was sent via a TDO to inpatient care at the Life Center of Galax, where he remained for three days. R. 541–86. Remines reported that he had a drinking problem for more than a year, and that he can stop drinking for only two or three days at a time. R. 547. Remines later stated that the longest "clean time" he had was five months, from September 2008 to February 2009.[5] R. 551. Remines was placed on a Serax detox regimen, which was described as successful while Remines was at the facility. R. 545. Remines also participated in the development of his treatment plan and attended various therapy sessions at the Life Center. Notes reflect that Remines' "overall response to treatment was good and good progress was made in addressing the patient's level of chemical dependence knowledge and denial issues." R. 543. Upon discharge, Remines was assessed a GAF score of 65, suggestive of mild limitations, and counselors indicated that Remines had no functional limitations at discharge. Remines was instructed to continue medication and counseling, and to attend seven AA or Narcotic Anonymous meetings per week. R. 542. While at the Life Center, Remines requested that the Free Clinic prescribe Campral for treatment of his alcohol dependence. R. 431.

Following discharge from the Life Center, Remines commenced a series of more regular visits to counselors at Mt. Rogers. On May 22, 2009, Remines reported that he had not craved alcohol in a week, and that he felt "very good" during that time and had been keeping busy.

---

[5] This statement is inconsistent with records from that time period, some of which do suggest alcohol use.

R. 416. Remines expressed interest in intensive outpatient treatment group program when it was recommended to him. R. 415–16. On May 28, 2009, Remines was sober and compliant with his medication and reported no depression symptoms. R. 415. Remines started group therapy at Mt. Rogers in June 2009 and reported that he was "doing a lot better now that he is not using alcohol." R. 413. Remines' sobriety and improvement continued in July, August, and early September 2009, and he regularly reported during group sessions that he was doing well. R. 396–407, 409, 412. Remines stated that he was a different person now that he was sober (R. 396) and that he was "a better person all around" since being detoxed. R. 400.

Remines relapsed in mid-September 2009, when he admittedly drank enough beer and liquor to get drunk. R. 395. Shortly thereafter he went to the Free Clinic with complaints of anxiety. R. 429. Remines was apparently compliant with medication in October 2009 and denied using alcohol since his last visit, but was still experiencing anxiety. R. 437. On January 25, 2010, Remines reported being abstinent (R. 501) although he later reported that had used during that period. R. 448.

On February 10, 2010, William Humphries, M.D. performed a mental status examination as part of an overall physical consultative examination. R. 439–41. Dr. Humphries' mental status examination findings were unremarkable. R. 440. At a visit to the Free Clinic, Remines admitted relapsing in February 2010 by binge drinking. R. 500. At an initial intake assessment at Mt. Rogers on March 12, 2010, Remines was assessed by a social worker as having only mild or moderate impairment because of his symptoms, and was given a GAF score of 60. R. 451, 455–56. Remines attended group therapy sessions in March and April 2010. R. 446–47.

Remines reported being off alcohol to Mr. Fiebig at Mt. Rogers on May 6, 2010. R. 444–45. Ms. Fiebig noted that Remines appearance and behavior was unremarkable, but that Remines

9

was sad, irritable, and anxious. On June 24, 2010, Remines told Ms. Fiebig that his symptoms of anxiety—including hot spells, an inability to relax, unsteadiness, and nervousness—occur once or twice a day lasting up to 30 minutes, and especially in crowds. R. 458–59. Remines did state that his depression symptoms were mild and that he felt that they had improved a lot.

On July 29, 2010, Remines reported that he was depressed and that his medications weren't working. R. 499. His medications were adjusted by the Free Clinic and he was encouraged to maintain sobriety. In August 2010, Ms. Fiebig at Mt. Rogers encouraged Remines to attend group therapy sessions for his anxiety and depression. R. 465–66. Remines did not follow up with this recommendation, and Mt. Rogers subsequently closed his file due to inactivity on January 7, 2011. R. 469.

On January 4, 2011, Remines began a series of counseling sessions with psychotherapist Robert W. Smith, Ph.D., at the Free Clinic, with complaints of a depressed mood and anxiety. R. 497. Remines stated that the medication he had been taking had stopped being helpful, and that his depression "comes and goes." Dr. Smith diagnosed bipolar disorder and polysubstance dependence and recommended different medications, continued counseling, and attendance at AA meetings. R. 494, 490. At follow up visits, Remines appeared friendly, relaxed, and in a positive, non-manic mood. R. 495–96.

At another initial assessment at Mt. Rogers, Remines reported that he had quit drinking March 2, 2011. R. 471. On mental status examination, Remines appears unremarkable, with a detached/apathetic mood, unremarkable perceptions and thought processes. R. 472. Remines reported among other symptoms being restless and withdrawn, and having memory problems. Ms. Fiebig noted that Remines suffered from mild or moderate limitations in functioning, and assessed a GAF score of 60. R. 474.

10

On April 26, 2011, Remines was hospitalized after he drank alcohol and overdosed on the sleeping medication Remeron. R. 508–11. Remines stated that the day before he was not feeling depressed at all, but that when he started drinking he became depressed. R. 508. Remines reported that he "just felt like he wanted to get away from it all" and began to consume pills. He told providers at the hospital that he drinks several times a week, in amounts anywhere from two to 24 beers. R. 508. Remines was discharged to the Southwestern Mental Health Institute after a 23-hour observation period. R. 512–13. Remines adamantly denied that the overdose was a suicide attempt, stating that he was trying to get some sleep by taking the pills. R. 528. Remines also stated that he was noncompliant with his medications. Remines started on Paxil and Seroquel, and tolerated these medications well while at the Institute. At discharge, Remines was assessed with a GAF score of 55, and was alert, had a euthymic mood, appropriate affect, intact memory, and good insight and judgment. R. 529.

Remines was transferred to inpatient care at Mount Rogers on April 29, 2011, where he remained until May 4, 2011. Remines reported on May 3 and 4, 2011 that he was feeling ok following the overdose, and he was described as stable. R. 540. At a follow-up visit to Mt. Rogers on May 5, 2011, Remines stated that his new medications were helping him keep fairly stable. R. 596. Ms. Fiebig again recommended an intensive outpatient program for Remines' substance abuse. On May 19, 2011, Remines stated to Ms. Fiebig that he was doing well while sober, and rated his depression 4/10 that week. R. 599.

On May 20, 2011, Remines restarted group substance abuse sessions, and reported that he was doing better following his overdose. R. 598. Sage Lockhart, M.D., described Remines as stable on May 23, 2011 and adjusted his medication. R. 609. He again began reporting at group sessions that he was doing well while sober numerous times during June 2011. R. 592–95. On

11

July 6, 2011, Remines stated that he still drank on weekends because he has nothing else to do. R. 591. However, Remines continued to report progress with reduced drinking in July 2011. R. 588–91

Dr. Smith at the Free Clinic saw Remines on August 5, 2011, and assessed a GAF score of 59, and described his behavioral functions as "full." R. 494. On September 8, 2011, Remines reported to Dr. Lockhart at Mt. Rogers that he was feeling well. R. 630. Remines also continued to report that he was doing well in group therapy sessions in September and October 2011. R. 646, 648–50, 652. Remines reported that he smoked pot on a daily basis, but that he had stopped drinking as much as he once did. R. 649–50. Remines began missing therapy sessions in October 2011 (R. 643–645) and soon reported having anxiety and trouble sleeping again. R. 641.

On September 13, 2011, licensed clinical psychologist Ralph Ramsden, Ph.D., performed a consultative examination of Remines at the request of his disability attorney. R. 613–20. During the examination, Remines presented with mild anxiety but no overt clinical depression. R. 613. Remines denied recent problems with alcohol, stated that he had infrequently used marijuana in the past, and denied any past misuse of prescription pills other than his 2010 overdose on sleep medication. R. 616. Remines described to Dr. Ramsden "fairly dramatic and uncontrollable shifts in his mood," temper control problems, and symptoms of anxiety. R. 617. Objective personality testing revealed mild-moderate exaggeration of clinical symptoms. R. 618–19. Dr. Ramsden described Remines as a "socially apathetic and emotionally detached individual who probably has a limited range of emotion." R. 620. Dr. Ramsden assessed a GAF score of 35, and diagnosed Remines with major depressive disorder, generalized social phobia, and a personality disorder.

State agency psychologists evaluated Remines' file twice as part of his disability claim. On February 19, 2010, Julie Jennings, Ph.D., reviewed Remines' records and developed an opinion of Remines' mental residual functional capacity. R. 72–73. Dr. Jennings found that Remines had no worse than moderate limitations in spheres of mental work-related functioning, including understanding and memory; sustained concentration and persistence; and social interaction. In many functional areas, Dr. Jennings found no significant limitations at all. As a result, Dr. Jennings determined, Remines would be restricted to simple, unskilled, non-stressful work. R. 73.

On May 3, 2010, psychologist Louis Perrott, Ph.D. performed a second state agency evaluation on reconsideration of Remines' claim. R. 86–88. Dr. Perrott similarly found that Remines suffered no worse than moderate limitations in any area of mental work-related function, and that "apart from his substance abuse, this claimant would be restricted to simple, unskilled, non-stressful work requiring minimal social interaction." R. 88.

From this medical record, I find that it to be a reasonable conclusion that Remines' substance use was a contributing factor material to the determination of disability. In other words, substantial evidence supports the finding that if Remines were to stop his alcohol and substance use, he would not be disabled. The record shows that, for the most part, when Remines was sober and receiving treatment, his symptoms of depression and anxiety did not cause disabling limitations.

The most telling evidence supporting the ALJ's decision are Remines' own statements during substance abuse therapy during periods in 2009 when his alcohol consumption was curtailed or he was sober entirely. These statements demonstrate that Remines' substance use had a profound impact on his functionality, and that when he was not abusing substances, his

13

mental health was generally well. R. 396 (September 11, 2009: "doing well," "trying to work on making things better now that he is sober," "different person than before"), R. 397 (September 2, 2009: "doing well"), R. 398 (August 26, 2009: "doing well," "now realizes that alcohol did not solve any of his problems"), R. 399 (August 21, 2009: "doing well," "tries to find other alternative to not drink"), R. 400 (August 19, 2009: "doing well," "since being detoxed he has become a better person all around"), R. 401 (August 7, 2009: "doing well," "has now had to find new ways to deal with his problems"), R. 402 (August 5, 2009: "doing well"), R. 403 (July 29, 2009: "doing well"), R. 404 (July 24, 2009: "doing well," "reports no use of alcohol at present time"), R. 405 (July 22, 2009: "doing well," "reports no use of alcohol or drugs at this time"), R. 406 (July 17, 2009: "doing well," "reports that he has not been using drugs or alcohol"), R. 407 (July 15, 2009: "doing well," "continues to stay alcohol free and is doing well with this") R. 409 (July 8, 2009: "doing well," "continues to remain alcohol free"), R. 413 (June 26, 2009: " doing well," "doing a lot better now that he is not using alcohol"), R. 415 (May 28, 2009: "abstinent currently," "reports no current depression symptoms"), R. 416 (May 22, 2009: "felt very good" following week of no alcohol), R. 421 (April 9, 2009: "can socialize now even if sober"). From these numerous records alone a reasonable mind might accept as adequate to support the conclusion that Remines was not disabled when sober.

 Perhaps equally telling is the correlation between Remines' substance abuse and his most severe mental health episodes. Both of Remines' June 2008 hospitalizations coincided with excessive alcohol and illicit substance consumption, confirmed by his own admission as well as objective medical findings. R. 322–33, 306–21. In May 2009 when he was hospitalized for suicidal ideations, he admitted that he was currently using alcohol. R. 551. He was discharged sober with a GAF score of 65, suggestive of only mild limitations. R. 542. Records from

14

Remines' hospitalization following his overdose on sleeping medication in April 2011 state that he was not feeling depressed, started drinking, and *then* got depressed, leading to the overdose. R. 508. At no time was Remines hospitalized when he wasn't abusing alcohol and drugs.

Furthermore, Remines' records from mental health providers at the Free Clinic and Mt. Rogers support the ALJ's decision. When Remines was discharged sober from inpatient care at the Life Center in May 2009, his counselor found no functional limitations and assessed a GAF score of 65. R. 542. Two initial functional assessments from Mt. Rogers when Remines reportedly was sober showed no more than mild or moderate impairments in mental virtually all work-related functioning, as well a GAF score of 60. R. 451, 474. Treating psychotherapist Dr. Smith found on August 5, 2011 that Remines had full behavioral function, had normal thought process and orientation, and assessed a GAF score of 59. R. 494. This evidence suggests that absent Remines' substance use disorder, he did not suffer from disabling mental health limitations.

Finally, the medical opinion evidence in the record supports the conclusion that Remines was not disabled absent his substance use disorder. The thorough examination by Dr. Carusi resulted in his conclusion that Remines was likely capable of understanding simple and more detailed and complex directions, and that Remines' symptoms may somewhat interfere with his ability to maintain work attendance, "but are not likely to significantly impair his comprehension, performance, or relationships at work." R. 382–83. Both state agency psychologists found that Remines was capable of performing simple, unskilled, non-stressful work. R. 73, 88. The report from Dr. Ramsden, perhaps the opinion most suggestive of disability, shows that Remines was not forthright about his history of substance abuse. R. 615–16. Even so, Dr. Ramsden noted that objective personality testing suggested mild-to-moderate exaggeration of

15

Remines' symptoms, and Dr. Ramsden did not put forth an opinion of Remines' residual functional capacity independent of his substance use disorder. R. 620.

For these reasons, there is substantial evidence to support the ALJ's determination that Remines abuses substances and that his symptoms of anxiety and depression would not render him disabled if he stopped using alcohol. Accordingly, substantial evidence supports the ALJ's determination that he is not disabled. See Blankenship v. Astrue, 635 F.Supp.2d 447, 452 (W.D. Va. 2009) (affirming ALJ's denial of benefits to Plaintiff who "engage[d] in regular and excessive use of alcohol"; although the record showed she was not "free of nonalcohol related physical and mental problems[,]" there was substantial evidence to support the conclusion that her alcoholism was a contributing factor material to the disability evaluation).

Remines puts forth ancillary arguments regarding the ALJ's analysis of the cumulative effect of his impairments, the ALJ's failure to perform an "individualized consideration" of his mental impairments, and the ALJ's failure "to probe the significance of Remines' non-exertional impairments." Pl.'s Br. Summ. J. 9 – 10. To the extent these arguments may be considered separate and apart from Remines' main contention regarding his substance abuse, these arguments too must fail. Having reviewed the record in full, I find that the ALJ committed no such errors.

Remines does not articulate how the ALJ failed to consider the combined effect of his impairments under 20 C.F.R. § 404.1523, other than to mention that Remines suffered from depression and bipolar disorder. Pl.'s Br. Summ. J. 9–10. However, the ALJ's decision reflects careful consideration of Remines' mental health symptoms, supported by the wealth of evidence outlined above. Likewise, nothing in the ALJ's decision suggests that the ALJ failed to consider Remines' mental health limitations in an individualized manner, or failed to develop the record

as to Remines' nonexetional impairments. The ALJ provided a thorough recitation of the medical evidence, which included countless visits to mental health providers over the relevant period and numerous opinions as to his functional ability. In sum, after reviewing the ALJ's opinion and the record as a whole, I find that the ALJ's decision is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

Enter: July 18, 2014

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge